UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
ASHLAND DIVISION
CIVIL ACTION NO.: 09-CV-00047-DLB
*Electronically Filed*

MARGARET ELIZABETH POFF by and
Through her Power of Attorney and
Next Friend, MONA TUSSEY                                        PLAINTIFF

vs.

DIVERSICARE MANAGEMENT SERVICES CO.
d/b/a WURTLAND NURSING AND REHABILITATION

and

DIVERSICARE LEASING CORP.
d/b/a WURTLAND NURSING AND
REHABILITATION CENTER                                          DEFENDANTS

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION

**********

Now come Defendants, Diversicare Management Services Co., d/b/a Wurtland Nursing and Rehabilitation, and Diversicare Leasing Corp., d/b/a Wurtland Nursing and Rehabilitation Center, (hereinafter collectively "Wurtland") and hereby submit that its pending Motion to Compel Arbitration is sound and should be granted. Plaintiff's brief in opposition to this motion raises several legal arguments which require the within Reply in Support.

The issue before this Court is whether or not an arbitration agreement between the parties should be enforced. It is well-settled that doubt regarding the applicability of an arbitration agreement should be resolved in favor of arbitration. *See, e.g., Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, (1983); *Ferro Corp. v. Garrison*

*Industries, Inc.,* 142 F.3d 926, 932 (6th Cir. 1998). If parties contract to resolve their disputes in arbitration rather than in the courts, a party may not renege on that contract absent the most extreme circumstances. See *Southland Corp. v. Keating,* 465 U.S. 1, 24, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); *Dean Witter Reynolds, Inc. v. McCoy,* 995 F.2d 649 (6th Cir.1993). The Kentucky courts agree, finding in *Valley Const. Co, Inc. v. Perry Host Management Co.,* Inc., 796 S.W.2d 365, 368 (Ky.App.1990), that:

> [O]nce prima facie evidence thereof has been presented, the statutory presumption of its validity (KRS 417.050) accrues, and the burden of going forward with evidence to rebut the presumption then shifts to the party seeking to avoid the agreement ... **and this is a heavy burden.** (Emphasis added, citations omitted).

Plaintiff herein has not met this heavy burden. A review of the evidence in the record demonstrates no such extreme circumstances exist in the case at bar. Instead, the parties to this litigation each executed an agreement requiring that disputes arising between them be submitted to arbitration.

In an effort to escape the plain language of the contract, Plaintiff has crafted various attacks on the arbitration agreement by claiming that because her attorney-in-fact does not remember signing the agreement more than eight years ago, it must be the product of fraud and/or struck as unconscionable. Plaintiff also claims that although her attorney-in-fact had authority over all transactions related to claims, litigation, and health care, the attorney-in-fact did not have the legal authority to sign this particular contract. Such arguments are nonsensical at best.

Taking the Plaintiff's argument to its logical end, any contract entered into by any party with a nursing home, funeral home, hospice, hospital, rehabilitation center, or other health care

provider would be voidable at the whim of the signatory. Plaintiff's arguments in this regard are nothing less than an attack on contracts, and the ability of businesses and individuals to contract.

As already demonstrated in the pending Motion to Dismiss, the parties entered into a binding, valid arbitration agreement. This arbitration agreement is specifically enforceable under the Federal Arbitration Act, as well as under Kentucky law, even subsequent to the recent decision of the Kentucky Supreme Court in *Ally Cat, LLC v. Chauvin*, 274 S.W.3d 451 (Ky. 2009). Given all of the foregoing, this Court should require the parties to arbitrate their dispute, as they agreed to do at the onset of their relationship.

### A.    The Ally Cat Decision Has No Impact On The Enforceability Of The ADR Agreement In This Case.

Plaintiff argues that the recent Kentucky Supreme Court case of *Ally Cat, LLC v. Chauvin*, 274 S.W.3d 451 (Ky. 2009), has called into question whether Kentucky's Circuit Courts have jurisdiction to enforce arbitration agreements under the Kentucky's Uniform Arbitration Act (KRS 417.045, *et seq.)* when those agreements do not contain express language that the arbitration itself will occur inside Kentucky. In *Ally Cat,* the dispute concerned the effect of an arbitration provision in a home owner's limited warranty document provided to the representative of a condominium owner the day after the closing on the sale. The argument in that case concerned alleged water and mold damage that occurred in the condo unit (used as a pediatric clinic) after it was purchased. There was no arbitration agreement in *Ally Cat* that was executed by any party to the dispute. The arbitration provision was merely contained in a home owner's limited warranty provided to the owner the day after closing.

Under these facts, the Kentucky Supreme Court found that that there was no valid agreement to arbitrate. The Court also looked to language from Kentucky's Uniform Arbitration Act (KRS Chapter 417), specifically KRS 417.200, which states that "[t]he making of an

3

agreement described in KRS 417.050 providing for arbitration in this state confers jurisdiction on the court to enforce the agreement under this chapter and to enter judgment on an award thereunder." The *Ally Cat* court reviewed the holdings of *Tru Green Corp. v. Sampson,* 802 S.W.2d 951 (Ky. App. 1991) and *Artrip v. Samons Construction, Inc.,* 54 S.W.3d 169 (Ky. App. 2001) to mean that Kentucky courts do not have jurisdiction to enforce an arbitration award when the underlying arbitration does not occur within this Commonwealth. The *Ally Cat* court then went on to interpret KRS 417.200 to mean that Kentucky courts only have jurisdiction to enforce arbitration agreements under the KUAA if the arbitration agreement provides that the arbitration itself will occur within this Commonwealth. Of particular note is the fact that none of these cases concerned enforcement of arbitration agreements under the Federal Arbitration Act, 9 U.S.C. §1, *et seq.* ("FAA").

Plaintiff's reliance upon the *Ally Cat* decision is misplaced and contrary to Kentucky's well-settled law construing contracts, including familiar constitutional principles prohibiting the impairment of contractual obligations. The ADR agreement in dispute was executed in 2001, more than eight years before the *Ally Cat* decision. As such, this Court must examine the ADR agreement under the laws existing at the time the contract was executed.

### 1.    *Parties presumed to contract under then-existing laws.*

It is well-settled that implicitly included in the terms of contracts are the laws subsisting at the time and place of the making of the contract. *Corbin Deposit Bank v. King,* 384 S.W.2d 302, 304 (Ky. 1964) (citing *City of Covington v. Sanitation Dist. No. 1,* 301 S.W.2d 885, 888 (Ky. 1957)). It has also been said that "the rule is elementary that the laws in force when and where the contract is made form a part of the contract". *Leslie County v. Maggard,* 212 Ky. 354, 279 S.W. 335, 338 (1926) (citing *Collins v. Collins' Adm'r,* 79 Ky. 92 (1880)). It is also well-

settled, that "where a written contract can be construed so as to be lawful and proper, such a construction will be preferred to one that would make the contract unwarranted." Id. (citing *Berry v. Frisbe,* 120 Ky. 337, 86 S.W. 558 (1905)). The rights accorded to parties by statute "at the time of contracting become a part of the operative facts which govern their relationships." *Grayson Rural Electric Corp. v. City of Vanceburg,* 4 S.W.3d 526, 531 (Ky. 1999). Similarly, "it is a familiar principle of constitutional law that constitutional and statutory provisions in effect at the time a contract is made become a part of the contract." *City of Florence v. Owen Elec. Co-op., Inc.,* 832 S.W.2d 876, 882 (Ky. 1992) (citing *Whitaker v. Louisville Transit Co.,* 274 S.W.2d 391 (Ky. 1954)). These elementary rules apply as equally to contracts between private parties as they do to contracts of public bodies. *Moore v. Babb,* 343 S.W.2d 373, 376 (Ky. 1961) (citing *Board of Education for Jefferson County v. Littrell,* 173 Ky. 78, 190 S.W. 465 (1917)).

The ADR Agreement at issue in the case before this Court was executed on January 18, 2001, well before the Kentucky Supreme Court rendered the *Ally Cat* decision in January of this year. The *Ally Cat* decision represents a substantial departure from Kentucky law as it existed on January 18, 2001. Kentucky law is clear that, at the time the ADR Agreement at issue in this case was executed, the parties had every reason to believe that it was an enforceable agreement under Kentucky law.

### 2. *Courts cannot administer statutes so as to impair the obligation of contract.*

The true and correct rule is that if the contract when made was valid under the laws then, in effect, its validity and obligation cannot be impaired by subsequent action of the legislature, or by decisions of the courts. *Drane v. Weston,* 276 Ky. 810, 125 S.W.2d 722, 724-725 (1939) (citing *Gelpcke v. City of Dubuque,* 1 Wall. 175, 68 U.S. 175, 206, 17 L.Ed. 520 (1863)). In

order for a law to impair the obligation of a contract, the obligation must be rendered invalid, must be released or extinguished. *Adams v. Associated General Contractors of Kentucky, Inc.,* 656 S.W.2d 729, 730 (Ky. 1983) (citing *City of Covington v. Sanitation District No. 1,* 301 S.W.2d 885, 888 (Ky. 1957)). Other authority states that a law unconstitutionally "impairing obligation of contract" need not import actual destruction of such obligation, but is also inoperative if such obligations are impaired in any degree or are weakened or otherwise made less operative. *Cotton v. Walton-Verona Independent Graded School Dist.,* 295 Ky. 478, 174 S.W.2d 712, 715 (1943). Similarly, it has been held that any law changing the intention and legal effect of the original parties to a contract which then gives to one party a greater or to the other party a lesser interest or benefit in the contract, operates to impermissibly impair the obligations thereunder, irrespective of the extent of the change. *Kentucky Utilities Co. v. Carlisle Ice Co.,* 279 Ky. 585, 131 S.W.2d 499, 504 (1939).

In this case, it is clear that the virtually identical ADR Agreements to the one at issue here (which do not contain explicit language requiring arbitration to occur in Kentucky) have been routinely enforced in Kentucky's Circuit Courts. Until the Kentucky Supreme Court's decision in *Ally Cat, LLC v. Chauvin,* 274 S.W.3d 451 (Ky. 2009) was rendered, it is extremely doubtful that any court in Kentucky ever refused to enforce an arbitration agreement under the Kentucky Uniform Arbitration Act because it failed to contain *Ally Cat's* "magic words". Giving the *Ally Cat* decision the effect of entirely invalidating the ADR Agreement entered into between Wurtland and Plaintiff certainly operates to impair the contractual obligations of the parties thereunder, in violation of Ky. Const. §19 and Article I, Section 10 of the U.S. Constitution.

**3.     *Prospective application of Ally Cat is constitutionally permissible.***

In order to harmonize the holding in *Ally Cat* with what are undoubtedly thousands of arbitration agreements that would otherwise be enforceable, this Court should give prospective application to those arbitration agreements entered into on or after the date the *Ally Cat* decision was rendered -- January 22, 2009.

Kentucky's highest court, in discussing the import of *stare decisis,* has previously written as follows:

> We are not unmindful of the importance of courts of last resort adhering to rules of law announced in long-established decisions that have become a part of the jurisprudence of the state, and on the faith of which people have transacted business, entered into contracts, and conducted in a general way their affairs, and we should be slow to overrule any opinion that might unsettle property rights acquired on the faith of the opinion overruled, or that might prejudice the rights or interests of persons who had entered into engagements in reliance upon the fact that the opinion assailed was the law of the land.
>
> But the rule of *stare decisis,* stated in simple form and considered in relation to its effect upon private affairs, is really nothing more than the application of the doctrine of estoppel to court decisions. It finds its support in the sound principle that when courts have announced, for the guidance and government of individuals and the public, certain controlling principles of law, or have given a construction to statutes upon which individuals and the public have relied in making contracts, they ought not, after these principles have been promulgated and after these constructions have been published, withdraw or overrule them, thereby disturbing contract rights that had been entered into and property rights that had been acquired upon the faith and credit that the principle announced or the constructions adopted in the opinion was the law of the land.
>
> *Oliver Co. v. Louisville Realty Co.,* 156 Ky. 628, 161 S.W. 570, 575 (1913), overruled on other grounds.

In that same opinion the Court later cited to several decisions of the U.S. Supreme Court that are applicable here:

> And to *Douglass v. Pike County,* 11 Otto 677, 101 U.S. 677, 686,
> 25 L.Ed. 968 (1879), where the court said: "As a rule we treat the
> construction which the highest court of a State has given a statute of
> the State as part of the statute, and govern ourselves accordingly ...
> The true rule is to give a change of judicial construction in respect
> to a statute the same effect in its operation on contracts and existing
> contract rights that would be given to a legislative amendment; that
> is to say, make it prospective, but not retroactive. After a statute has
> been settled by judicial construction, the construction becomes, so
> far as contract rights acquired under it are concerned, as much a
> part of the statute as the text itself, and a change of decision is, to
> all intents and purposes, the same in its effect on contracts as an
> amendment of the law by means of a legislative enactment." To the
> same effect is *Havemeyer v. Iowa Co.,* 3 Wall. 294, 70 U.S. 294, 18
> L.Ed. 38 (1865); *Pine Grove Township v. Talcott,* 19 Wall. 666, 86
> U.S. 666, 22 L.Ed. 227 (1873).

> *Id.* at 577.

This Court is faced with a similar issue in how to apply a drastic change in judicial interpretation of statute. The most prudent course would be to give *Ally Cat* prospective application to those arbitration agreements entered after its effective date.

### 4.    *The Contracts Clause of the U.S. Constitution mandates arbitration.*

The right to arbitration is specifically reserved in the Kentucky Constitution. Wurtland believes that the interpretation of *Ally Cat* and its progeny urged upon this Court by Plaintiff, if accepted, would violate the Contracts Clause of the United States and Kentucky Constitutions.

The Contracts Clause of the United States Constitution provides that, "[n]o State shall ... pass any ... [l]aw impairing the Obligation of Contracts." U.S. CONST. art. I § 10.

Likewise, Section 19 of the Kentucky Constitution states in pertinent part as follows:

> (1) No ex post facto law, nor any law impairing the obligation of
> contracts, shall be enacted.

In *American Express Travel Related Services v. Kentucky,* 597 F.Supp. 2d 717, 728, (2009, E.D. Kentucky), the court laid out the following standard of review applicable to an analysis of the respective contract clauses of the U.S. and Kentucky Constitutions:

The purpose of the Contract Clause is not simply to prevent harm to the parties engaged in the contractual relationship. The Contract Clause is meant to protect certainty in business dealings and to encourage private agreements. See *Home Bldg. & Loan Assoc. v. Blaisdell*, 290 U.S. 398, 428, 54 S.Ct. 231, 78 L.Ed. 413 (1934) ("The power of changing the relative situation of debtor and creditor ... had been used to such an excess by the state legislatures, as to break in upon the ordinary intercourse of society, and destroy all confidence between man and man.") To prove a violation of this provision, a plaintiff "must demonstrate that a change in state law has operated as a substantial impairment of a contractual relationship." *Quick Cornmc'ns, Inc. v. Mich. Bell Tel.*, 515 F.3d 581, 587 (6th Cir.2008) (internal quotations omitted). **If a substantial impairment exists, the Court must inquire as to whether the impairment was "reasonable and appropriate in the service of a legitimate and important public purpose,"** *United States v. County of Muskegon*, 298 F.3d 569, 584 (6th Cir.2002). (Emphasis added.)

\*\*\*

One of the driving purposes behind the Contract Clause is to ensure certainty in private contracting; \*\*\*.

Similarly, in *Black Mountain Energy Corp. v. Bell County Bd. of Educ.*, 467 F.Supp.2d 715 (E.D.Ky., 2006), the court stated as follows in regard to the applicable standard of review where there is a claim that a change in state law violates the Contract Clause of the federal and state constitutions:

[A] plaintiff must demonstrate that a change in state law has operated as a substantial impairment of a contractual relationship. In deciding whether such a demonstration has been made, the court must ask whether (1) a contract exists, (2) a change in law impairs that contract, and (3) the impairment is substantial. If a contractual obligation is substantially impaired by the change in law, the court must further inquire whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in the service of a legitimate and important public purpose.

*Manscio v. Public Employees Retirement System of Ohio*, 160 F.3d 310, 314 (6th Cir.1998) (citations and internal quotation marks omitted).

> [T]he first inquiry must be whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244-245, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).

If this Court determines that state law, as interpreted by *Ally Cat, LLC. v. Chauvin*, has effected a change that invalidates the ADR Agreement at issue here, then the Court should also consider whether the change in law has substantially impaired the contractual obligations of these parties. It is manifest that the change in law will have substantially impaired Defendant's contractual rights under such a scenario, as all Defendants' rights under the ADR Agreement will have been completely eviscerated. An analysis of whether such a change was "reasonable and appropriate" and in service of a legitimate public policy should compel the conclusion that no important public policy is being served by refusing to enforce arbitration agreements in this context.

There is no evidence in this record that the rights of residents and their families are being ignored, minimized, or suppressed by being compelled to arbitrate disputes in accordance with their previously executed contracts requiring them to do just that. There is also no basis to conclude that these arbitration proceedings are not fair and impartial, or that residents are being short-changed by the results of these proceedings. The only "evidence" of such matters consists of the unsworn innuendo, conjecture, and speculation of attorneys with vested financial interests in protracting, rather than resolving, disputes between nursing home residents and their families and nursing home facilities. Accordingly, the same Kentucky public policy that encourages arbitration generally should also apply in this context.

**B.      Plaintiff's Attorney-In-Fact Was Presented With The Entire Admissions Agreement Prior To Its Execution.**

Plaintiff attempts to attack the validity of the ADR Agreement she signed by insinuating that the Agreement could have been altered or otherwise manipulated. She bases this theory on the fact that the contract which she signed does not contain page numbers and the belief that the fifth page of the contract has a space at the beginning of the page. These arguments are without merit. As noted by Sandy Caudill, the former social service director at Wurtland who was present at Plaintiff's admission, the attached nine-page Admission Agreement was presented to Ms. Tussey in its entirety during Plaintiff's admission to Wurtland. (See Affidavit of Sandy Caudill, ¶9, attached hereto as Exhibit A). There have been no admissions, deletions or other changes made to the Agreement. (Id., ¶10). Moreover, Ms. Tussey was asked to review the document fully and invited to ask any questions regarding the document prior to its execution. (Id., ¶12). It is understandable that Ms. Tussey may not remember executing or reviewing the contract over eight years ago, but merely forgetting one signed a document cannot serve as the basis for setting aside a validly executed contract. Regardless, the attached Affidavit of Sandy Caudill demonstrates Ms. Tussey was indeed presented with the Admission Agreement in its entirety, including the ADR Agreement, and executed the contract in her capacity as Plaintiff's attorney-in-fact. (Id.). As such, there can be no argument that Wurtland has failed to produce the entire Admission Agreement or that Wurtland failed to provide Ms. Tussey with a copy of the ADR Agreement at the time of Plaintiff's admission.

**C.      As Plaintiff's Attorney In Fact, Mona Tussey Was Authorized To Execute The ADR Agreement.**

Plaintiff makes the untenable argument that her duly appointed power of attorney did not have the authority to sign the ADR agreement. This argument is without merit. On January 18,

11

2001, Mona Tussey admitted her mother to Wurtland. (See Exhibit A, ¶5). At the time, Ms. Tussey represented that she was the attorney-in-fact for Plaintiff and presented Wurtland with a valid General Power of Attorney. (Exhibit A, ¶7 and Power of Attorney for Margaret Elizabeth Poff, attached hereto as Exhibit B).

Ms. Tussey was then presented with a nine-page Admission Agreement. (Exhibit A, ¶9). As the legal representative for Plaintiff, Ms. Tussey signed the following acknowledgement indicating that she read the entire Admission Agreement:

> I (we) hereby acknowledge that I (we) have read this page and the preceding pages. This Agreement constitutes the entire agreement between and/or among the parties, and it may not be amended except by written agreement of the parties. I (we) further acknowledge that the resident, and/or other party signing this Agreement, if any, have made the above promises and representation in order to induce the nursing home to enter into this Agreement, and the resident, and/or other party signing this Agreement, if any, acknowledge that the nursing home is entering into this Agreement, is relying upon the truthfulness of the promises and representations of the resident, and/or other party signing this Agreement, if any, herein.

(Exhibit C, p. 7 of 9).

Ms. Tussey signed this acknowledgement in her capacity as the "legal designee" for her mother. (Exhibit C, p. 8 of 9).

Despite these facts, Plaintiff makes the argument that her daughter, the person to whom she entrusted as her attorney-in-fact, did not have the authority to execute the ADR Agreement. Plaintiff's argument in this regard is wrong. First, the General Power of Attorney executed by Plaintiff confers broad powers upon Ms. Tussey. These powers include authorization for (A) Real estate transactions; (B) Tangible personal property transactions; (C) Bond, share and commodity transactions; (D) Banking transactions; (E) Business operating transactions; (F) Insurance transactions; (G) Gifts to charities and individuals; **(H) Claims and litigation**; (I)

Personal relationships and affairs; (J) Benefits from military service; (K) Records, reports and statements; (L) Full and unqualified authority to my attorney-in-fact to delegate any of all of the foregoing powers to any person or persons whom my attorney-in-fact shall select; (M) Access to safe deposit box(es); **(N) All other matters; (O) All health matters**. (See Exhibit B).

It is disingenuous to argue that a power of attorney which provides the attorney-in-fact with the express authority over all issues related to "claims and litigation" and "all health matters" is not sufficient to confer power upon the attorney-in-fact to execute an ADR Agreement contained in a nursing home admission contract. Such claims have been considered and rejected by the courts across the county. *See Northport Health Services of Arkansas, LLC v. Robinson*, Civil No. 08-5223, 2009 WL 140983 (W.D. Ark. Jan. 12, 2009) (Finding arbitration agreement contained in nursing home admission contract which was executed by daughter of resident who held power of attorney for her mother was valid and enforceable because, as her mother's power of attorney, daughter was empowered to sign the contract on her mother's behalf); *Mitchell v. Kindred Healthcare Operating, Inc.*, No. W2008-00378-COA-R3-CV, 2008 WL 4936505 (Tenn. Ct. App. Nov. 19, 2008) (Finding the power of attorney gave wife authority as attorney-in-fact to execute ADR agreement upon husband's admission to a nursing home.); *Jaylene, Inc. v. Moots*, 995 So.2d 566 (Fla. Dist. Ct. App. 2008) (Holding that attorney-in-fact had authority to bind principal to arbitration agreement contained in nursing home care contract.); *Necessary v. Life Care Ctrs. of America*, No. E2006-00453-COA-R3-CV, 2007 WL 3446636 (Tenn. Ct. App. Nov. 16, 2007) (Finding that where patient orally gave his wife express authority to sign all documents necessary for his admission to the nursing facility, wife had authority to sign an ADR agreement; *Briarcliff Nursing Home, Inc. v. Turcotte,* 894 So.2d 661 (Ala.2004) (In addressing the validity of two separate arbitration agreements, one of which had

been signed by someone with a power of attorney, the Alabama Supreme Court ultimately concluded that both arbitration agreements were valid); *Triad Health Management of Georgia, III, LLC v. Johnson*, 679 S.E.2d 785 (Ga.App. 2009) (Finding agreement to arbitrate signed by patient's son as fiduciary was valid and enforceable); *Hogan v. Country Villa Health Services*, 148 Cal.App.4th 259 (2009) (Holding that mother's designation of daughter in durable power of attorney for health care authorized daughter to enter into binding arbitration agreement); and *Smalley v. JHA-Markleysburg, Inc.,* 3 Pa.D. & C.5th 471 (Pa. Ct. Com. Pl. 2007)(Holding power of attorney validly executed ADR agreement on patient's behalf).

In the present case, Plaintiff essentially argues that she gave her daughter express authority to handle all of her contractual, legal, and health care transactions - except one: Ms. Tussey did not have Plaintiff's authority to sign an ADR agreement. The implication of Plaintiff's argument is that an attorney-in-fact may make one "legal decision", contracting for health care services for the principal, but not another, agreeing in the contract to binding arbitration. That result would be untenable and cannot be used to invalidate the contract signed by Ms. Tussey as attorney-in-fact for Plaintiff.

**D.  Well-Established State and Federal Public Policy Favoring Arbitration Is In No Way Inconsistent With The Right To A Jury Trial.**

Plaintiff argues the ADR Agreement is not valid because it impermissibly extinguishes Plaintiff's right to a jury trial. This argument is not supported by the law. The Sixth Circuit Court of Appeals has flatly rejected the claim that an ADR agreement is invalid because it waives the right to a jury trial. "As to the failure of the arbitration clause to include a jury waiver provision, 'the loss of the right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate'." *Burden v. Check Into Cash of Kentucky, LLC*, 267 F.3d 483, 492 (6th Cir.2001), (quoting *Sydnor v. Conseco Fin. Serv. Corp.*, 252 F.3d 302, 307 (4th Cir.2001)); *see also*

*Pritchard v. Dent Wizard Internat'l Corp.,* 275 F.Supp.2d 903, 918-19 (S.D.Ohio 2003) (claimant unlikely to succeed on claim that his right to jury trial superseded arbitration clauses). The Seventh Amendment confers not the right to a jury trial *per se,* but rather "only the right to have a jury hear the case once it is determined that the litigation should proceed before a court. If the claims are properly before an arbitral forum pursuant to an arbitration agreement, the jury trial right vanishes." *Bank One, N.A. v. Coates,* 125 F.Supp.2d 819, 834 (S.D.Miss.2001), *aff'd,* 34 Fed.Appx. 964 (5th Cir.2002); *accord Marsh v. First USA Bank,* 103 F.Supp.2d 909, 921 (N.D.Tex.2000) (citing *Geldermann, Inc. v. CFTC,* 836 F.2d 310, 323 (7th Cir.1987)).

The law of Kentucky is no different. In *Dutschke v. Jim Russell Realtors*, 281 S.W.3d 817 (Ky. App. 2008), *discretionary review denied* May 13, 2009, the court recently observed that the Kentucky Uniform Arbitration Act (1) does not implicate jural rights; (2) does not violate the state constitution by denying the right to a jury trial; (3) does not violate the principle of separation of powers; and, (4) provides meaningful judicial review to comply with due process. In short, binding precedent in this Commonwealth specifically precludes casting aside on a whim, predictable contractual obligations.

In *Dutschke*, the court addressed the propriety of an arbitration clause in a standard residential real estate contract prepared by the Greater Louisville Association of Realtors. The purchaser sought to challenge the constitutionality of Kentucky's Uniform Arbitration Act contending it violated Kentucky's "jural right" doctrine or Section 7 of the Kentucky Constitution which states, "The ancient mode of trial by jury shall be held sacred, and the right thereof inviolate, <u>subject to such modification as may be authorized by this Constitution</u>." (emphasis added). In turn, Section 250 of the Kentucky Constitution states, "[i]t shall be the duty of the General Assembly to enact such laws as shall be necessary and proper to decide

differences of arbitrators, the arbitrators to be appointed by the parties <u>who may choose that</u> <u>summary mode of adjustment</u>." (emphasis supplied). See also, Article VI, Section 10 of Kentucky's Second Constitution adopted in 1799 and Article 8, Section 10 of Kentucky's Third Constitution adopted in 1850.

The right to a jury trial is certainly important. In Kentucky, as elsewhere, however, waiver of a jury trial is no more complex than not asking for one. "The failure of a party to serve a demand . . . constitutes a waiver by him of trial by jury." CR 38.04. Moreover, a jury trial is not warranted where the right "does not exist under the Constitution or statutes of Kentucky." CR 39.01(b).

Obviously, the legislature and the courts have been aware of jural rights during the entire period of time that the have formulated, articulated and restated the public policy strongly favoring arbitration, as an efficient and fair dispute resolution process. Both state and federal public policy implicitly recognize that enforcing arbitration agreements is not inconsistent with the right to trial by jury. Any attack on the ADR Agreement at issue here as somehow denying Plaintiff her right to a jury trial would thus be both illogical and ill-informed.

**E.       Wurtland Did Not Breach Their Fiduciary Duty To Plaintiff.**

Plaintiff claims that "fraud may be established when the defendant is in a confidential or fiduciary relationship with the plaintiff and the defendant conceals or fails to disclose a material fact to the plaintiff." (R. 13, Response to Motion to Compel, p. 24). However, the general statement has no relevance in the case at bar, because there is absolutely no evidence in the record to suggest Wurtland concealed or otherwise failed to disclose the existence of the ADR Agreement. Instead, during the admission process, Ms. Tussey, Plaintiff's attorney-in-fact, was presented with an Admission Agreement. (Exhibit A, ¶ 9). Ms. Tussey was encouraged to read

16

the Agreement in its entirety and given the opportunity to ask any and all questions she may have regarding the terms of the Agreement prior to signing it. (Id., ¶ 12). The Agreement itself is written in plain terms which are easily understandable to a lay person.

Under the section of the Agreement titled, "THE RESIDENT, THE RESIDENT'S REPRESENTATIVE, THE LEGAL GUARDIAN, OR THE RESPONSIBLE PARTY, IF ANY, AGREE TO:" was a paragraph entitled "OPTIONAL ARBITRATION CLAUSE." (Exhibit C, p. 4). In addition, there was no concealment or failure to disclose this fact to Ms. Tussey. (See Exhibit A, ¶ 11). Under these facts, there can be no argument that Wurtland was untruthful to Plaintiff or otherwise concealed the existence of the ADR Agreement.

**F.      The ADR Agreement Is Not Unconscionable As A Matter Of Law.**

Under Kentucky law, the doctrine of unconscionability is a "narrow exception" to the fundamental rule that a "written agreement duly executed by the party to be held and who had an opportunity to read it, will be enforced according to its terms." *Conseco Finance Servicing Corp. v. Wilder*, 47 S.W.3d 335, 341 (KY.App.2001) (citing *Cline v. Allis-Chalmers Corp.*, 690 S.W.2d 764 (Ky.App.1985)). An unconscionable contract is "one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other." *Id.* (quoting *Louisville Bear Safety Service, Inc. v. S. Central Bell Telephone Co.*, 571 S.W.2d 438, 440 (Ky.1978)). Stated differently, an arbitration agreement is not unconscionable merely because the arbitral rights of the parties are imbalanced, *Wilder*, 47 S.W.3d at 343. Instead, an arbitration agreement may be unconscionable, and therefore unenforceable, if the arbitral forum is biased or the terms of the arbitration are so one-sided that no reasonable person would willingly enter into such an agreement. Id. at 342; *see generally Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306 (6th Cir.2000).

Plaintiff argues to this Court that the ADR Agreement executed by her power of attorney was unconscionable because Plaintiff's power of attorney "lacked the experience and education necessary to appreciate the impact of the arbitration agreement" she signed. (See R. 13, p. 22) Plaintiff also claims that generally speaking, admitting a family member to a nursing facility can be "an overwhelming experience for families" and that the resident's family "is no doubt under the unique and very real stress and grief that accompanies admitting a loved on to a long term care facility." (Id.) However, there is absolutely no evidence before this Court to support the argument that Ms. Tussey did not understand the contract she signed, was not given the opportunity to question the contract prior to execution, or was under any stress or experiencing any grief at the time she knowingly executed the ADR Agreement.

Generalities and innuendo are insufficient to strike a valid contract. The doctrine of unconscionability is only to be used by the courts to police the excesses of certain parties who abuse their right to contract freely. It is directed against one-sided, oppressive and unfairly surprising contracts, and not against the consequences per se of uneven bargaining power or even a simple old-fashioned bad bargain. See *Valued Services of Kentucky, LLC v. Watkins* --- S.W.3d ---, *4, 2009 WL 1705696 (Ky.App.,2009). The ADR Agreement executed by Plaintiff's attorney-in-fact is not one-sided, oppressive, or unfairly surprising. The evidence reveals the ADR Agreement was boldly displayed and its existence was emphasized in the contract document. (See Exhibit C, p. 4, "OPTIONAL ARBITRATION CLAUSE.") The Agreement was plainly written using everyday language capable of being understood by persons of ordinary education and experience. Ms. Tussey was given every opportunity to read the provision; and the provision did not alter the principal bargain--the admission for nursing services--between Plaintiff and Wurtland in an extreme or surprising fashion.

Moreover, there is no testimony from Ms. Tussey that she was confused as to what this clause meant, or otherwise misled as to its import by the Wurtland staff at the time of Plaintiff's admission. As such, there is no evidence in the record to support Plaintiff's bald assertion that the ADR Agreement is unconscionable.

**G.      The ADR Agreement Is Supported By Sufficient Consideration.**

As correctly noted by Plaintiff, the ADR Agreement executed by Ms. Tussey was not mandatory and could have been deleted by agreement of the both Plaintiff and Wurtland prior to Plaintiff's admission to Wurtland. However, this fact does not render the Agreement unenforceable for lack of consideration. Instead, an ADR clause such as the one at bar which requires both parties to submit equally to arbitration constitutes adequate consideration as a matter of law. See, *Kruse v. AFLAC Intern., Inc.,* 458 F.Supp.2d 375 (E.D.Ky.,2006). In this case, the ADR paragraph of the Agreement was neither concealed nor disguised, and its provisions were clearly stated such that the parties would likely to be able to understand it. At a minimum, such a reader would understand the plain language of paragraph twelve which provided that "[a]ny controversy or claim arising out of or relating to the Agreement, or the breach thereof, shall be settled by arbitration...". As the Agreement contains reciprocal obligations for both Plaintiff and Wurtland, it is therefore a valid contract. See *Seawright v. Am. Gen. Fin. Servs., Inc.,* 507 F.3d 967, 974 (6th Cir.2007) (holding that adequate consideration existed to support an ADR agreement because "the arbitration process was binding on both employer and employee...").

Similarly, the ADR agreement between Wurtland and Plaintiff, while voluntarily entered into, is binding upon both parties to this action. As such, the Agreement was supported with

sufficient consideration and this case should be arbitrated pursuant to the clear expression of the parties to the Agreement.

### H.     Conclusion.

Plaintiff signed a valid ADR Agreement encompassing the very claims she now brings before this Court. Defendants have the right, as a corporate citizen of the State of Kentucky, to contract and the right to expect that their contracts will be enforced. At the very least, Defendants should be secure in the expectation that contracts will not be enforced unilaterally against them, while the consumers they contract with are given the ability to pick and choose if the contracts will be enforced, when they will be enforced, and in what manner they will be enforced.

Plaintiff's recent opposition to the pending Motion to Dismiss asks this Court to refuse Defendants the most basic of protections under the United States Constitution and Kentucky Constitution, as well as state and federal law regulating a business' right to contract with its customers. Plaintiff's opposition in this regard is not well-founded.

Respectfully submitted,

Reminger Co., L.P.A.

/s/ Paul A. Dzenitis
Paul A. Dzenitis, Esq.
Donald L. Miller, II, Esq.
One Riverfront Plaza
401 West Main Street - Suite 710
Louisville, Kentucky 40202
Telephone: (502) 584-1310
Facsimile: (502) 589-5436

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the counsel of record.

/s/ Paul A. Dzenitis

Paul A. Dzenitis, Esq.